The UNITED STATES of
America, Plaintiff,

v.

Louis LAYMON, Jr., Defendant.

No. 89–CR–113.

United States District Court,
D. Colorado.

Jan. 26, 1990.

See also 127 F.R.D. 534.

Daniel Cassidy, Asst. U.S. Atty., Denver,
Colo., for plaintiff.

David Lane, Denver, Colo., for defen-
dant.

ORDER GRANTING MOTION TO
SUPPRESS EVIDENCE

CARRIGAN, District Judge.

Defendant Louis Laymon, Jr. has filed a
motion to suppress evidence obtained by
the government during a March 8, 1989
search of his automobile after a traffic stop
on Interstate 70 in Eagle County, Colorado.
Laymon is charged with violating Title 21
U.S.C. § 841(a)(1) and (b) (possession with
intent to distribute cocaine) and Title 21
U.S.C. § 846 and Title 18 U.S.C. § 2 (con-
spiracy to possess cocaine with intent to
distribute.)  He is a 21–year–old Black resi-
dent of California.

Defendant contends: (1) that the search
of his automobile was made following a
pretextual traffic stop and therefore violat-
ed his Fourth Amendment right to be free
from unreasonable searches and seizures,
and (2) that the consent to search, given by
him on a printed form he signed during the
traffic stop, was the product of trickery,
coercion or both, and not freely and volun-
tarily given.  Plaintiff, the government,
contends that the search was carried out
pursuant to a voluntary consent following
a valid traffic stop.

During extensive hearings both parties
introduced evidence, including exhibits and
the testimony of numerous witnesses.
Briefs have been filed and the issues are
ripe for decision.  Jurisdiction is not ques-
tioned.  This memorandum constitutes my

findings of fact pursuant to Rule 12(e), Fed.R.Crim.P.[1]

## I. Findings of Fact.

### A. *Pretextual Stop.*

On March 8, 1989, at about 2:10 p.m., the defendant Louis Laymon, Jr. was riding as a passenger in a vehicle titled or registered in the name of his sister, Edjunia Laymon, but actually owned by him.[2] The vehicle, bearing California license plates, was being driven East toward Denver by Alvin Riley. Both Laymon and Riley are Black. Sergeant James Perry ("Perry"), of the Eagle County Sheriff's Department, who is White, observed the Laymon vehicle traveling eastbound well within the 65 mile per hour speed limit on Interstate 70 ("I–70"). Perry, although employed by the Eagle County Sheriff's Department, was assigned to the High Country Drug Task Force.[3] At the time of the traffic stop here involved he was driving a sheriff's department vehicle that was unmarked except for decals on its sides. It had no overhead lights or other characteristics to distinguish or identify it as a police car when viewed from the front.

Perry testified that while following the Laymon vehicle he observed it gradually moving or edging toward the right shoulder of the road until the right front tire ultimately contacted the white line separating the travelled portion of the highway from the shoulder. He described this motion as "weaving." Perry did not assert, however, that the "weaving" he allegedly observed included any gross movement such as swerving. Both Riley and Laymon denied that Riley ever allowed the vehicle to come into contact with or cross the white shoulder stripe. Testimony and a videotape indicated that the highway through the area in question curves through mountainous terrain.

Perry stated that he became concerned by the car's "weaving" and he briefly signaled with his siren for the vehicle to stop.

He testified that the car's occupants appeared not to notice the siren because they failed to stop. Perry also testified that he attempted to flash the red light or lights installed in or behind his car's grill. Again this effort elicited no apparent response from the vehicle.

Riley and Laymon testified that Perry never activated either his siren or his lights to signal Riley to stop the vehicle. Eagle County Sheriff A.J. Johnson testified that he recalled Perry having informed him at a later date that an electrical problem had prevented the red lights on Perry's vehicle from functioning properly. As stated, the patrol car had no overhead lights. I find that Sheriff Johnson was a credible witness and thus find that the car driven by Sergeant Perry had non-functioning red lights under its front grill, and therefore even if Perry did attempt to activate those lights, as he testified, they did not come on.

Finally, Perry testified, he pulled alongside the California vehicle and motioned the driver to pull over. Riley immediately complied. Riley and Laymon testified that neither had any idea who Perry was or what he wanted until he pulled alongside and motioned for Riley to pull over. They testified that they did not realize until Perry pulled alongside that the car behind them was a police car.

Perry, Riley and the defendant Laymon all testified that after pulling the Laymon vehicle over, Perry took Riley's driver's license and the vehicle registration and returned to his patrol car for five to ten minutes. While waiting for Perry to return, Riley got out and stood by the rear of the car. When Perry returned, he issued a written warning to Riley for weaving.

At this point, Perry's, Riley's and Laymon's testimony diverges drastically. Perry testified that after he issued the warning to Riley he approached Laymon, who was still in the front passenger seat, and

---

1. At the time the decision of this matter was announced in open court, I was unable to complete this memorandum in writing in advance of its announcement.

2. *The parties stipulated to this fact.*

3. The Drug Task Force is an arm of the Eagle County Sheriff's Department that receives money and training from the Federal Drug Enforcement Administration for purposes of investigating drug related activity.

asked him to step out of the car. He stated that he informed Laymon that the Eagle County Sheriff's Department had been having problems with people carrying narcotics, large amounts of cash and firearms through the county. Perry stated that he then asked Laymon for consent to search the vehicle, and Laymon voluntarily agreed. Perry testified that he returned to his vehicle to obtain a consent to search form, and that Laymon signed that consent form after fully reviewing it.

Riley testified that after Perry issued him the warning for weaving, Perry informed him that the Eagle County Sheriff's Department had been having problems with people transporting drugs and weapons. According to Riley, Perry then said that Laymon would also have to sign a warning for weaving. Riley stated that Perry then approached Laymon, who was seated in the front passenger seat, and that he (Riley) could not hear the verbal exchange between Perry and Laymon.

Laymon testified that Perry approached the passenger side of the car and told him to step out of the car. Laymon stated that he complied and Perry then told him that he would have to sign a warning for weaving. He stated that Perry put a piece of paper on the hood of the car for Laymon to sign, and that he (Laymon) signed it without examining or reading it to see what the document actually stated. Next, Laymon stated that Perry mentioned the drug trafficking problems and asked Laymon if he could search the vehicle.

Riley and Laymon both testified that Laymon had refused to allow Perry to search the car but that Perry then had declared forcefully that Laymon had already signed a consent to search form. Laymon testified that he thought he had only signed a warning for weaving and not a consent to search form.

At this point Perry's, Riley's and Laymon's testimony again becomes consistent. At about the time Perry commenced searching the vehicle, a second white uniformed officer drove up to the scene and told Riley and Laymon to step away from the vehicle and face away while Perry searched the vehicle.

Upon opening the vehicle's hatchback, Perry observed what appeared to be a glove compartment type door on an inside wall panel. Perry testified that he either forced open the compartment or simply turned the knob. Riley and Laymon testified that they heard a loud "popping" sound that they believed to be Perry breaking the compartment door. Upon opening the door Perry observed a box of Kleenex in front of a cardboard inside wall that appeared to be dislodged or out of place. When he removed the cardboard wall separating the glove box from the car's metal shell, Perry discovered plastic bags filled with what appeared to be cocaine. Riley and Laymon were immediately arrested.

Perry's credibility was seriously undermined by cross examination. Perry admitted that he had a history of stopping vehicles based upon a "drug courier profile." He testified that he had received training from the Drug Enforcement Administration and the Eagle County Sheriff's office regarding drug courier profiles.

Further, Officer Lee Roybal, formerly of the Eagle County Sheriff's Department and the chief training officer of the Drug Task Force, testified that the primary assignment of the Drug Task Force is drug interdiction, not traffic enforcement. He stated that it is the Colorado Highway Patrol's responsibility to enforce traffic laws on I–70, whereas the Drug Task Force investigates and attempts to curtail the transportation of illicit drugs on that highway. Clearly, at the time Perry stopped Laymon's car his primary responsibilities concerned narcotics laws and not traffic control.

Perry testified that in performing his Drug Task Force duties, he evaluates many factors to determine whether a particular person fits a drug courier profile. For example, Perry claimed that he considered whether the vehicle contained fast food wrappers, a map with cities marked, a radar detector, luggage in the passenger compartment rather than the trunk, and numerous other seemingly innocuous

factors. Perry admitted, however, that during the period when he was stopping cars and seeking consents to search based solely upon the "profile," he could not have discerned these factors during his first observation of a vehicle because it would have been impossible for him to really examine a car's contents without first stopping it. These factors obviously could not have played a part in Perry's decision to stop a vehicle.

Perry was therefore forced to admit that his initial observation of a vehicle would give him only very limited information, including its make and model, whether its plates indicated that it was a rental vehicle, and the state of its registration as indicated by the license plates.

In evaluating Perry's credibility and the weight to be accorded his testimony, I have considered among other factors, his testimony that physical limitations on his vision make it difficult or impossible for him to discern whether a person is Black, Hispanic or Anglo. He testified that he suffers from both astigmatism and color blindness. His astigmatism requires him to wear glasses. With regard to his asserted color blindness, Perry swore that it is nearly impossible for him to distinguish among Black, Hispanic and White people. There was no hint of any medical opinion or other evidence to support that assertion.

Perry testified that the louvers on the back of Laymon's vehicle, rendered it impossible for him to identify the race of its occupants. Indeed, he went so far as to testify that even when he pulled alongside the defendant's vehicle, a few feet from it in broad daylight, his color blindness prevented him from determining that the driver and passenger were Black. On cross examination, however, he testified that in looking around the courtroom, he was able to distinguish Blacks, Whites and Hispanics, but that he could not always do so while on duty as a law officer. Laymon's and Riley's complexions are very dark and they are obviously Black. I find to be incredible Perry's testimony that he could not distinguish Black from non-Black drivers in broad daylight.

Additional evidence to support that finding as to credibility is found in prior testimony from an unrelated Eagle County case, *People v. Jose Fernando Encines.* Perry's testimony there contradicts his claim of vision restricting his ability to tell Blacks from Whites limitations by sight. He testified in that case that he had been able to identify by sight an Hispanic male who fit a description on a "wanted" poster in his office. He only observed that man in a car travelling toward him at approximately 65 m.p.h. while he was walking on I–70. After giving a motorist a ticket, he was walking back to his car on Interstate 70, when he observed the car coming. Perry chased Encines in his patrol car and discovered that Encines, although an Hispanic male, was not the same Hispanic male described on the "wanted" poster. Because Perry was able to make an identification based upon race under those circumstances and based upon my evaluation of Perry's credibility, I find that he was able to and did determine the sex, approximate age and race of the occupants of the defendant's vehicle before stopping it. This conclusion is also supported by Riley's and Laymon's testimony that they had no knowledge that Perry was a police officer who wanted them to stop until Perry drove alongside their vehicle and signaled them to pull over.

Perry's daily activity logs, admitted into evidence, provided additional damage to his credibility. The logs were recorded from August 10, 1988 to May 8, 1989. The logs reflect that during this period, Perry made approximately 200 highway stops. Of that 200, 188 were stops of out of state vehicles. These logs also confirm that Perry's duties were primarily narcotics enforcement because he did not issue any traffic tickets during any of the recorded stops, but at most issued only traffic warnings.

Despite these entries in his own activity log, Perry testified that his pattern and practice of stopping individuals has nothing to do with a vehicle's state of registration. He testified that he stops all vehicles that violate traffic laws in his presence regardless of their place of origin.

In an apparent attempt to salvage lost credibility, Perry testified that if statistics prove that he overwhelmingly stops out of state vehicles, it is because during the ski season, most of the vehicles on I–70 in Eagle County are from out of state. Even a cursory examination of Perry's activity logs, however, belies this testimony. Officer Roybal testified that the ski season begins on Thanksgiving and ends in early April. Perry's daily logs show no change in the pattern of stopping out of state vehicles, regardless of the season, from August to May. Nor is there any claim by Perry that a disproportionately higher number of out of state skiers are Black or Hispanic than White.

More troubling than the evidence demonstrating that out of state travelers are at far greater risk of being subjected to highway stops in Eagle County, with all the implications that situation has in light of the Fourteenth Amendment's equal protection and privileges and immunities clauses, is the irrefutable evidence that Blacks and Hispanics were far more likely to be stopped by Perry than White, non-Hispanic motorists. This was proven by several items of evidence.

Perry testified that of all the stops he made from August 10, 1988 to May 8, 1989, only ten to fifteen percent involved Hispanic drivers. When confronted with the fact that approximately fifty percent of all of his consent to search forms obtained during that time period had been signed by motorists with Spanish surnames, Perry could only conclude that this alarming statistical disparity was coincidental. Of the remaining half, those not Spanish surnamed, at least some were Blacks who testified in this court about their encounters with Perry.

Jhenita and Janice Whitfield, two young Black women testified that they were stopped, while driving a car with California plates, for the alleged offense of failing to signal a sufficient distance prior to changing lanes on I–70, a four-lane highway. Along with their four infant children they testified that they were forced to stand alongside the highway in cold mountain weather for more than forty-five minutes while Perry searched their car, unpacking their luggage and rummaging through all their personal clothing and belongings. No contraband was found, and the only product of this exercise was the anger of these citizens who felt that they had been pressured to submit to the search because of their race. Perhaps ironically, one of them had served for years in the military service of the United States and had elected that service as her career.

Byron Boudreaux, a young black male, testified that he was stopped by Perry while driving a car with Oklahoma plates through Eagle County on I–70. Perry and two other officers informed him that they had received an anonymous tip that a man fitting his description was carrying drugs. Boudreaux testified that he was detained for approximately forty-five minutes while Perry and the other officers searched his car.

Aguinaldo Ferreria, a young Black male, was stopped by Perry while driving a car with California plates through Eagle County on I–70. Perry told him that he fit a description of someone suspected of carrying drugs. Ferreria was detained for about forty-five minutes while Perry conducted his search.

These Black drivers indicated that Perry gave them the impression the searches would be of the vehicle and would delay them only a few minutes, but the actual searches involved going through all their luggage and personal effects and took far longer.

Michael Misukanis, a young white male with hair longer than shoulder length, testified that he had been stopped by Perry while driving an old car with a loud engine and blotched body paint through Eagle County on I–70. His car carried California license plates. Perry told him that he fit a drug dealer description. Unlike the other victims who testified, Misukanis declined to give Perry consent to search his car. Perry persistently tried to pressure Misukanis to consent by stating that his refusal to consent indicated that he was transporting drugs. After an exchange lasting fifteen

to twenty minutes, Misukanis asked Perry if he was going to be arrested for failing to sign the consent to search form. Finally, Perry allowed him to leave. There was no indication that Perry customarily informed those stopped that they were free to leave if they did not consent to a vehicle search. While not dispositive, the absence of such notice is a factor to be considered in determining whether a consent is voluntary.

The fact that Blacks and Hispanics are frequently targeted by the Eagle County Drug Task Force was further highlighted during the hearings on this matter, when Perry, Officer Roybal and Sheriff A.J. Johnson all testified that being Black or Hispanic was and is a factor in their drug courier profile on which they decide who to stop and search. Perry and Sheriff Johnson reluctantly made this admission, while Officer Roybal candidly admitted that race is part of the profile. Officer Roybal's admission is noteworthy and entitled to substantial weight because he was in charge of training for the Drug Task Force. This evidence was not contradicted.

Further evidence of a pattern, practice and habit of racist law enforcement is Perry's admission that in December of 1988 he had stopped three young Blacks with California license plates because he thought they might be gang members carrying drugs or weapons. Upon obtaining a "consent" to search, he found twenty pounds of cocaine. No charges were ever filed, however, because the Eagle County District Attorney concluded that Perry had violated the suspects' Fourth Amendment rights.

Perry testified that the arrest of the young blacks from Los Angeles taught him that "profiling" based on race was unconstitutional as a sole justification for stopping a vehicle. As a result of the District Attorney's refusing to file charges in that case, he asserted that he began to use traffic stops, rather than profiles, as his means of stopping vehicles. He claimed that his entire practice as a Drug Task Force officer changed and that he would no longer simply stop people because they were Black or Hispanic with out-of-state plates. However, the irrefutable evidence shows, and I find, that his practice was to stop disproportionately larger numbers of Blacks and Hispanics with out-of-state license plates on the pretext that they were committing some trivial traffic violation for which he would not have stopped Anglo drivers with Colorado license plates.

After the District Attorney refused to file the case involving the twenty pound cocaine seizure, Perry's activity logs markedly changed. His logs for the period prior to the December 1988 arrest, are filled with the notation "CI" meaning "criminal investigation" as the reason for the stop. Perry testified that the "CI" stops had been based solely on profiles.

After the December 1988 arrest, Perry entered "TE" as his reason for the stops, explaining that this stood for "traffic enforcement."

If Perry's own records are to be construed literally, Perry went from being a Drug Task Force officer who went for days at a time without ever concerning himself with any traffic violations, to a drug enforcement officer obsessed with traffic enforcement. The logs, however, reflect that Perry's routine was unaffected by his sudden passion for traffic enforcement. He still stopped approximately the same number of vehicles as he had stopped when he was admittedly unlawfully "profiling," and his primary focus remained on out of state vehicles. His consent forms continued to be signed by a disproportionately high percentage of Spanish surnamed people. In fact, from February to May 1989, Perry made 106 stops and obtained consents to search from twenty-eight persons. Fourteen, or one-half, of these individuals had Hispanic surnames. I reject as incredible the proffered explanation that this is explainable on the ground that Eagle County has a large number of Hispanic residents. The government presented no census or other statistics to support that contention, and even if true, it would not justify the disproportionately high number of stops and consents to search signed by Hispanic named travellers whose vehicles had out-of-state license plates. Surely most of them were not Eagle county residents.

The sworn testimony of Riley and Laymon provides further evidence of Perry's habit, practice and modus operandi to engage in pretextual stops. Their testimony, even when discounted by obvious factors likely to affect their credibility, is still more credible than Perry's after the other witnesses described his practices. Both unequivocally testified that Riley was not weaving at any time prior to being pulled over by Perry.

Further, there is no evidence that a reasonable officer would have made a stop under the circumstances of this case. Colorado Highway Patrolman Rogozik, testifying on behalf of the government, attempted to address this issue by stating what he personally would have done under the circumstances faced by Perry on March 8, 1989. This officer's testimony regarding his own practices, is irrelevant because it assumes that the Laymon vehicle was in fact weaving, and I find as a fact that it was not. Moreover Patrolman Rogozik gave no opinion as to what a reasonable, prudent officer would have done in Perry's situation even if the Laymon car had been weaving. Rather he testified only as to what he personally would have done. That falls short of meeting the standard set for the Tenth Circuit in *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988).

I have considered Riley's and Laymon's testimony, Perry's testimony and his lack of credibility, the Highway Patrolman Rogozik's testimony and all the other evidence. I find as stated that the defendant's car did not weave or swerve in a manner that would have caused a reasonable, prudent police officer to pull it over for a traffic stop.

The inescapable conclusion from all the evidence is that Sergeant Perry engaged in a pattern and practice of making traffic stops based primarily on the most readily observable aspects of the vehicle that drew his attention as a Drug Task Force officer, *i.e.* out-of-state license plates and the driver's race or ethnicity. His failure to issue any traffic violation citations is further evidence that the traffic stops were merely subterfuges. I find as a fact that the alleged traffic stop in the instant case was pretextual.

### B. *Consent to Search.*

The period of time between the actual traffic stop and the issuance of the written warning for weaving was very brief.[4] Perry claims that he returned the vehicle registration and the driver's licenses of both occupants before he asked Laymon for a consent to search the car. Riley and Laymon on the other hand, testified that Perry never asked Laymon for a consent to search, but instead deceived him into signing a consent to search by telling him that it was a warning for weaving. Riley's testimony before me is somewhat inconsistent with his testimony before the grand jury. Riley, testifying before the grand jury on this issue, stated:

"Q. Did the officer force him to sign the form?

A. No. He did not tell him he had to or anything like that.

Q. In other words, Mr. Laymon freely signed it?

A. Yes.

Q. Mr. Laymon ever tell you what was going through his mind as to why he freely signed the form?

A. No.

Q. Did he ever tell you that he felt that he wouldn't be able to find the cocaine in the back of the car?

A. It was more or less we were just trying to be cool." (Transcript of Federal Grand Jury 88–1 (Denver), on April 12, 1989, at 33 and 34).

Therefore, it is somewhat suspicious, and casts serious doubt on Riley's and Laymon's credibility, that Riley deviated from his grand jury testimony when he testified before me that Perry had asked Laymon to sign a warning for weaving. Additionally, neither Riley nor Laymon testified that Perry coerced Laymon to sign the consent

---

**4.** This factor is evidence of a causal connection between the illegal stop and the consent. Cf. *U.S. v. Recalde*, 761 F.2d 1448 (10th Cir.1985).

to search through the use of force or the threat of force. Further, Laymon testified that he had completed high school and is fully capable of reading and writing. Therefore, from all the evidence and circumstances surrounding Perry's acquisition of Laymon's signature on the search consent form, I find that Sergeant Perry's testimony on this point is more credible than that of Laymon and Riley and therefore I find that Laymon probably knew that he was signing a consent to search form and did not sign under the misapprehension that he was signing a warning for weaving.

## II. Conclusions of Law.

### A. *The Pretextual Stop Issue.*

■ Defendant contends that Perry conducted an unconstitutional pretextual stop of the defendant's vehicle that justifies suppressing the cocaine thereafter discovered. The Tenth Circuit has adopted an objective test for determining whether an investigatory stop is pretextual and therefore unconstitutional. The Court of Appeals has stated that:

"a court should ask 'not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose.' [*United States v.] Smith,* 799 F.2d [704,] at 709 [ (11th Cir.1986) ]. 'That an officer theoretically *could* validly have stopped the car for a possible traffic infraction [i]s not determinative. Similarly immaterial [i]s the actual subjective intent of the deputy. [A] stop [i]s unreasonable not because the officer secretly hope[s] to find evidence of a greater offence, but *because it [i]s clear that an officer would have been uninterested in pursuing the lesser offence absent that hope.'* Id. at 710." *United States v. Guzman,* 864 F.2d 1512, 1517 (10th Cir.1988). (emphaisis added).

From my interpretation of the evidence, specifically Perry's demeanor and credibility, I already have determined that the alleged weaving of the defendant's car was a pretext for the invalid purpose of stopping it based on its California license plates and the race of its occupants. I find as a fact that Perry did not decide to stop the defendant's car until he pulled alongside and determined that Riley and Laymon were Black. The government has not carried its burden of proof to provide sufficient credible evidence that a reasonable, prudent officer would have made the stop absent the invalid purpose. Further, Perry's past habit and pattern of stopping vehicles based on a "profile" provides persuasive circumstantial evidence supporting a finding that he was uninterested in the alleged weaving as a traffic offense.

Lastly, Perry's lack of real interest in traffic law enforcement is strongly evidenced by his overall and consistent practice of not issuing traffic citations or "tickets," but merely warnings, and by his specific failure to follow-up by checking Riley's sobriety or competency to drive, a normal procedure for a police officer who observes a driver weaving.

Perry appeared to act in concert with and on instructions from the Eagle County Sheriff's Department and the Drug Task Force. He carried out policies that systematically violated the constitutionally protected rights of Blacks and Hispanics to travel and be free from unreasonable seizures on an equal basis with other persons travelling the highways of this nation. For these reasons, I conclude as a matter of law that on March 8, 1989 when Perry stopped his vehicle, the defendant suffered an unconstitutional pretextual stop amounting to a seizure that violated the Fourth Amendment.

This opinion does not hold that all "profile" investigatory stops are improper or unconstitutional. Higher courts have established guidelines for determining the validity of profile stops in the broad context. This case holds only that profile stops may not be predicated on unconstitutional discrimination based on race, ethnicity or state of residence.

Here the stop was tainted by violations of Laymon's rights guaranteed by the United States Constitution Amendment IV (freedom from unlawful seizures); Amendment I (freedom to travel); and Amend-

ment XIV (right to equal protection of the law and freedom from discriminatory law enforcement based on race; equal access of citizens of other states to privileges and immunities accorded to citizens of Colorado, including travel without harassment on Colorado highways). Amendment XIV applies the First and Fourth Amendments to restrict state action such as that here involved. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and its progeny require this court to suppress evidence obtained in violation of a defendant's Fourth Amendments rights.

### B. *Consent to Search.*

■ The question remains whether Laymon's consent to the search of his car was valid despite the constitutional violation. The government argues that the defendant's consent was free and voluntary and therefore it legitimized Perry's search.

The Tenth Circuit has stated that:

"When attempting to establish that there was voluntary consent after an illegal stop, however, the Government has a heavier burden to carry than when the consent is given after a permissible stop....

Moreover, when consent is obtained after an illegal arrest, the Government must establish a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Recalde,* 761 F.2d 1448, 1457–58 (10th Cir.1985).

In determining the voluntariness of the consent, *Guzman* stated:

"In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court held that where a confession is preceded by a Fourth Amendment violation, in determining the voluntariness of the confession the examining court must decide whether it was ' "sufficiently an act of free will to purge the primary taint" [of the illegal arrest].' ... Although the Court acknowledged that a determination of this issue is necessarily a complex one in which 'no single fact is dispositive,' ... it placed special emphasis on three factors: '[t]he temporal proximity of the arrest and the

confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct are all relevant.' " *Id.*

These three elements of voluntariness clearly apply in this Circuit when evaluating consents to search following a Fourth Amendment violation. *See Guzman, supra,* at 1520–21; *Carson,* 793 F.2d 1141, 1152 (10th Cir.1986); *United States v. Recalde, supra,* 1458.

The issue of consent is a question of fact. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Guzman, supra,* at 1520. *Guzman* stated that:

"This Circuit has held that when a consent to search is preceded by a Fourth Amendment violation, the consent is valid only if it is voluntary in fact. *United States v. Carson,* 793 F.2d 1141, 1151 (10th Cir.1986). A determination whether a particular consent is voluntary in fact is made by examining the totality of the circumstances surrounding the consent." *Guzman,* at 1520 (citing *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *Carson, supra,* at 1149).

Further, *Recalde* relied upon the Fifth Circuit's opinion in *United State v. Ballard,* 573 F.2d 913, 916 (5th Cir.1978) declaring that the government's burden to demonstrate the voluntariness of a consent is heightened when the consent is obtained following an illegal arrest. *Ballard,* interpreting prior Fifth Circuit case law, stated:

"The most significant factor relied upon by the court was a warning informing defendant of his right to refuse to permit the search.... The court reasoned: 'While warnings prior to a consensual search may not have the same indispensability as those required prior to a confession ... they do help insure that the consent is free, voluntary, and untainted by the arrest's possible illegality. In the instant case the presence of these warnings leads us to conclude that any coercion flowing from the possible illegality of appellant's arrest was dissipated.' ... Similarly ... this court held that advising a defendant of his right to refuse to

permit a search was a sufficient intervening occurrence to remove the influence of a prior fourth amendment violation." *Ballard, supra,* at 916 (quoting *Bretti v. Wainwright,* 439 F.2d 1042 (5th Cir.1971) (citing *United States v. Fike,* 449 F.2d 191 (5th Cir.1971)).

Here the defendant signed the consent to search form after Perry had violated his Fourth Amendment rights by committing a pretextual stop. I find as a fact that the government has not met its burden to establish that Laymon's consent was "sufficiently an act of free will to purge the primary taint" of the illegal stop, and therefore I find and conclude that the alleged consent was not free or voluntary. The government has presented no evidence that Perry informed Laymon that he could refuse consent. Although the government is not required to make such a showing and its lack, standing alone, is not dispositive, this factor may be considered when evaluating the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1972).[5]

I find that the evidence demonstrates that Perry, in the past, conducted, and at least in this case, continued to conduct, stops on I–70 in a manner creating a coercive and intimidating atmosphere that most people, especially young minority citizens, would find coercive and impossible to resist. The testimony of Jhenita and Janice Whitfield, Byron Boudreaux, Aguinaldo Ferreria and Michael Misukanis, although not dispositive as to the totality of the circumstances present here, persuades me that Perry probably followed his normal habit, routine or practice to create a coercive atmosphere when he stopped Laymon. See Rule 406, Federal Rules of Evidence. All of these individuals, with the exception of Misukanis, testified that they gave Perry consent to search because they felt intimidated and that they had no real alternative. Misukanis refused consent and was allowed to leave only after enduring Per-ry's unfounded accusations and pressure to consent for fifteen to twenty minutes.

If this nation were to win its "War on Drugs" at the cost of sacrificing its citizens' constitutional rights, it would be a Pyrrhic victory indeed. It ill behooves a great nation to compromise or sacrifice the freedoms of its citizens as the price of more efficient law enforcement. Many countries have written constitutions similar to ours that define the rights of their people in words as forceful and inspiring as those of the United States constitution. But for most people living under those other constitutions the rights so emphatically guaranteed them are hollow, because there is no practical means to enforce them. The rights they define are illusory and disappear like vapor in the face of governmental pressure. Our tradition is different. It requires judges and police officers, who are equally sworn to uphold the same Constitution, to enforce constitutionally guaranteed rights, even when their enforcement is unpopular and even when those rights are asserted on behalf of persons whose activities are considered despicable. If the rule of law—rather than the rule of man—is to prevail, there cannot be one set of search and seizure rules applicable to some and a different set applicable to others. We deal here with rights, not privileges. There must be one guarantee of rights for all. As a practical matter if we are not all free, none of us is really free, for exceptions which deny constitutional rights to some erode them for all. While we deal today only with denial of Mr. Laymon's rights, who knows which of us may be next.

A society cannot remain free or strong if it undermines its own principals. Law enforcement officials are not licensed to disregard the law—especially not the law enshrined in the Constitution. It is utter hypocrisy to celebrate as a national holiday the birthday of Martin Luther King, Jr. while applying to Blacks a practice of selec-

---

**5.** *Schneckloth* stated that: "[v]oluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth, supra,* at 248–49, 93 S.Ct. at 2058–59.

tive law enforcement in disregard of their constitutionally guaranteed status as equal citizens.

The Florida Supreme Court recently declared:

"Without doubt the inherently transient nature of drug courier activity presents difficult law enforcement problems. Roving patrols, random sweeps, and arbitrary searches or seizures would go far to eliminate such crime in this state [and nation]. Nazi Germany, Soviet Russia, and Communist Cuba have demonstrated all too tellingly the effectiveness of such methods. Yet we are not a state that subscribes to the notion that ends justify means. History demonstrates that the adoption of repressive measures, even to eliminate a clear evil, usually results only in repression more mindless and terrifying than the evil that prompted them. Means have a disturbing tendency to become the end result. And as Judge Glickstein noted in his dissent in *Snider v. State*, 501 So.2d 609, 610 (Fla.App. 1986):

'Occasionally the price we must pay to make innocent persons secure from unreasonable search and seizure of their persons or property is to let an offender go. Those who suffered harassment from King George III's forces would say that is not a great price to pay. So would residents of the numerous totalitarian and authoritarian states of our day.'" *Bostick v. State of Florida*, 554 So.2d 1153 (Fla.1989).

Considering Florida's past history in race relations and that it is probably the state most heavily impacted by drug trafficking, it would be ironic indeed if rights guaranteed by the Federal Constitution should be accorded greater protection in drug cases by the elected Florida state courts than by federal courts.

Although I have found that Laymon knew that he was signing a consent to search form, I further find as a fact that, under the circumstances existing at the time of his stop, any reasonable traveller, and especially two out-of-state young Black men in the company of two uniformed and armed white law officers on a roadside in rural Colorado, would not have felt that he could do anything other than sign the consent to search. In other words, I find as a fact that Laymon was coerced or intimidated into signing the consent to search. For this reason, I conclude that the government has not sustained its burden to demonstrate that his consent was "sufficiently an act of free will to purge the primary taint" of the illegal stop. Therefore, I conclude that the defendant is entitled to prevail on his motion to suppress.

Accordingly IT IS ORDERED that the defendant Laymon's motion to suppress is granted.

Each party shall bear his or its own costs.