837 F.Supp. 338 (1993)
Jhenita WHITFIELD, Janice Whitfield, Byron Boudreaux, Aguinaldo Ferriera, Sean Verne, Chad DeMoss, Michael Misukanis, individually and on behalf of all other persons similarly situated, Plaintiffs,
v.
The BOARD OF COUNTY COMMISSIONERS OF EAGLE COUNTY, CO, A.J. Johnson, Lee Roybal, James Perry, Larry Sherrell, Jeffrey Townsend, Mike McWilliams, Charles A. Phillips, Margaret Neff, Michael Bosley, Steven Juskey, Robert Dawson, Greg Casady, Dean Everding, James F. Plank, Steven Wade, Flint Chamber, Tom Carline, D.P. Zabrinski, Jeff Beavers, Cindy Hurd, A. Curtis, Defendants.
No. 90-C-1541.
United States District Court, D. Colorado.
November 9, 1993.
*339 *340 David H. Miller, Walter W. Garnsey, David Lane, Denver, CO, for plaintiffs.
George Meyer, David Brougham, Denver, CO, for defendants.

MEMORANDUM OPINION AND ORDER
CARRIGAN, District Judge.
Plaintiffs Jhenita Whitfield, Janice Whitfield, Byron Boudreaux, Aguinaldo Ferriera, Sean Verne, Chad DeMoss and Michael Misukanis, individually and on behalf of other persons similarly situated, commenced this action pursuant to 42 U.S.C. § 1983 and Fed. R.Civ.P. 23 alleging deprivations of their constitutional rights. Defendants are the Board of County Commissioners of Eagle County, Colorado, Eagle County Sheriff A.J. Johnson and various former or current officers of the Sheriff's Department.[1] Sheriff Johnson and the officers have been sued in both their official and individual capacities.
Plaintiffs have filed a motion for partial summary judgment. Defendants have responded by opposing that motion and cross moving for summary judgment. Plaintiffs oppose the defendants' motion.
The issues have been fully briefed and oral argument would not materially assist the decision process. Jurisdiction exists under 28 U.S.C. § 1331.

I. FACTUAL BACKGROUND.

The facts, for purposes of the instant motions, are:
In 1987, the Board of County Commissioners for Eagle County, Colorado, applied to the United States Department of Justice for funds to finance a drug strike force. The application was accepted and the High Country Drug Task Force was created in early 1988.
The Task Force was a multi-agency team led by the Eagle County Sheriff's office with the mission of intercepting drug traffickers along Interstate Highway 70. To achieve that end, officers were provided a list of indicators, or characteristics common to drug couriers. The indicators included: rental vehicles, vehicles owned by persons not in the vehicle, vehicles with out-of-state license plates, darkened windows or curtains, temporary CB antennas, radar detectors, structural modifications, welding burns, absence of luggage, air fresheners, fast food wrappers on the floor and loose screws in the trim or lying on the floor. Although the parties disagree on the extent to which the race or ethnicity of the automobile occupants was to be relied upon, there is no dispute that race was a consideration.[2]
The interdiction program was interrupted following an incident in December 1988 when three African American men driving a vehicle with California license plates were stopped because they provided a match to the indicators. Although twenty-three pounds of cocaine was found, no charges were filed because it was concluded that the officer involved did not have a legally sufficient basis to stop the car. The program was subsequently reinstituted after Task Force officers were instructed not to rely solely on the indicators as grounds for stopping a vehicle.
Plaintiffs are motorists who were stopped by the defendants between May and December 1988, the period from inception of the program until it was interrupted for reevaluation. No drugs were found as a result of stopping any of the plaintiffs, nor is there an allegation that the plaintiffs were anything other than ordinary highway travelers. Plaintiffs allege that they were stopped on the basis of the indicators alone and that those stops violated their Fourth Amendment right to be free from unreasonable searches and seizures, their Fourteenth *341 Amendment right to equal protection and their First Amendment right to travel freely.

II. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT.

Plaintiffs seek partial summary judgment as to the constitutionality of the Task Force's drug interdiction policy between May and December 1988.
Summary judgment is proper if the pleadings, depositions and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party opposing a properly supported summary judgment motion may not rest upon mere allegations of the complaint, but must set forth evidence of specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). A factual dispute is material only if, under governing law, its resolution might affect the action's outcome. A factual dispute is genuine only if a reasonable fact finder could return a verdict for the nonmoving party. Id.
Plaintiffs bear the burden of proving that they were deprived of constitutional rights. Therefore they must support their motion with credible evidence that, if uncontroverted, would entitle them to a directed verdict. Celotex, 477 U.S. at 331, 106 S.Ct. at 2556 (Brennan, J., dissenting). If that showing is made, the burden of production shifts to the defendants to put forward evidence showing that there is a genuine issue of material fact for trial. Id.
Plaintiffs assert that between May and December 1988, the Task Force had a policy of detaining motorists based solely on their match with some of the drug courier indicators. Much of the plaintiffs' evidence consists of testimony elicited in hearing a motion to suppress evidence in a criminal case before this court.[3]United States v. Laymon, 730 F.Supp. 332, 336-37 (D.Colo.1990).
At that hearing, Sheriff Johnson was asked whether the indicators alone were sufficient to justify a stop. He responded, "They could at that time," referring to the period from May to December 1988. Sgt. Perry's testimony and interrogatory responses also corroborate that mere application of the indicators was considered sufficient to justify a stop.[4] This evidence, if uncontroverted, would support a finding that the Task Force had a policy of stopping motorists if they provided a match to the indicators.[5] Therefore, to withstand the plaintiffs' motion, the defendants must put forward evidence showing that there is a genuine issue of material fact concerning this allegation.
*342 Defendants rely principally on an affidavit submitted by Sheriff Johnson. Although the affidavit is vague and, at times, contradictory,[6] it does state that in addition to seeking to observe the indicators, officers were instructed to rely on their experience and training, as well as the Colorado Peace Officer's Legal Source Book.
Even accepting this statement as true, it is hardly dispositive of the question here. Plaintiffs do not assert that the officers were not informed that other considerations could form the basis for a stop. Instead they put forward evidence, including the testimony of Sheriff Johnson and Sgt. Perry, that the officers' operating standard justified stopping a vehicle solely on observing the indicators. The fact that officers were also told about other grounds for stopping a motorist does not render the plaintiffs' allegation or the supporting evidence ineffectual. Nor does it amount to a clear denial of the plaintiffs' allegation. While the court must draw all reasonable inferences in favor of the nonmoving parties, it would not be reasonable to infer a denial that the defendants have not made, especially when that denial would be contrary to their prior testimony under oath in this court.
As a result I find that there is no genuine issue of material fact that between May and December 1988, Task Force officers carried out the interdiction program believing, and applying as a standard, that a motorist could be detained if he or she provided a match to the indicators.
This finding, however, is only part of the burden the plaintiffs must carry. They also must show that stops based upon mere application of the indicators violated the Constitution.
Investigatory stops of automobiles constitute seizures within the meaning of the Fourth Amendment. United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). "[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980). "[D]etaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 417-18, 101 S.Ct. at 694-95.
The inquiry encompasses two elements. Id., at 418, 101 S.Ct. at 695. First, police officers must rely on objective observations such as information from police reports or consideration of modes of operation. Id. Drug courier profiles fall into this category of objective observations. United States v. Clardy, 819 F.2d 670, 673 (6th Cir. 1987).
Second, the observations must yield individualized suspicion, i.e., the reasonable inference that a particular individual is breaking the law. Cortez, 449 U.S. at 418, 101 S.Ct. at 695. There must be more than an inchoate hunch that the person to be stopped is doing wrong. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).
The fact that a characteristic appears on a drug courier profile does not detract from its evidentiary significance. Id. at 10. For example, in Sokolow, DEA agents stopped a person who nervously had paid $2100 in cashusing twenty dollar bills peeled from a roll twice that sizefor two round trip airplane tickets between Honolulu and Miami. The DEA agents had information indicating that the person was traveling under an assumed name and they knew that he was staying in Miami, a drug source city, for just forty-eight hours, although the trip would take twenty hours. The Court held that this information justified an investigatory stop and the fact that the characteristics exhibited by the suspect appeared on a drug courier profile had no effect on that analysis. Id., at 10-11, 109 S.Ct. at 1587.
*343 Thus, Sokolow does not stand for the proposition that reasonable suspicion is established merely by matching a person to a profile. That position has been rejected by numerous courts.[7]United States v. Clardy, 819 F.2d 670, 673 (6th Cir.1987) ("[S]atisfying the drug courier profile does not, standing alone, justify a seizure."); United States v. Hanson, 801 F.2d 757, 762 (5th Cir.1986) ("Mere mechanical matching of characteristics thought to be common to all drug couriers can never meet the rigorous requirements of the fourth amendment."); United States v. Gooding, 695 F.2d 78, 83 (4th Cir. 1982) ("[A] drug courier profile, without more, does not create a reasonable and articulable suspicion."); United States v. Rico, 594 F.2d 320, 326 (2d Cir.1979) ("[S]uch a check list of recurrent characteristics can do no more than alert the special agent to initiate surveillance. More is required to warrant the intrusion of an investigative stop.").[8]Accord Reid, 448 U.S. at 441, 100 S.Ct. at 2754 (agent could not have reasonably suspected petitioner of criminal activity based solely on a drug courier profile); see also Florida v. Royer, 460 U.S. 491, 526 n. 6, 103 S.Ct. 1319, 1340, 75 L.Ed.2d 229 (1983) (Rehnquist, J., dissenting) ("[The drug courier profile] is not intended to provide a mathematical formula that automatically establishes grounds for a belief that criminal activity is afoot."). Instead Sokolow teaches that reasonable suspicion is established without reference to whether the information relied upon by the detaining officer appears on a profile.
Thus the question here is whether the information relied on by the Task Force in making indicator-only stops was sufficient to raise a particularized suspicion that the persons stopped were engaged in criminal activity.
Obviously many of the indicators relied on by the Task Force could not have been observed while a suspect vehicle was moving at interstate highway speeds, and therefore those indicators could not have been used to determine whether a stop was justified. Such non-obvious indicators include: persons traveling with no luggage, cars with air fresheners, fast food wrappers on the floor, loose screws in the trim or lying on the floor, and vehicles belonging to persons not in the car. Because structural modifications in vehicles are often used to provide hiding places for contraband, and therefore are designed to be not easily detected, this indicator, and the accompanying welding burns, must also be disregarded as indicia on which officers could rely to justify a stop.
Indicators that could be observed before a car was stopped include: the race of the occupants, whether the vehicle bears out-of-state license plates, darkened windows or curtains, a temporary CB antenna, a radar detector and, in some instances, whether the vehicle is rented.
Sheriff Johnson's affidavit states that race was an indicator only insofar as it related to intelligence information concerning drug smuggling by gangs with predominantly black members. This statement, however, does not explain how this information was *344 used and therefore is so vague as to be of little significance. For example, although the plaintiffs submitted the testimony of Mr. Boudreaux and Mr. Ferrerira from the Laymon suppression hearing, the defendants have not offered any evidence, or even alleged, that these stops were based on specific intelligence reports rather than mere skin color.
While race is an appropriate characteristic for identifying a particular suspect, it is wholly inappropriate to define a class of suspects. See United States v. Brignoni-Ponce, 422 U.S. 873 (1975). Without particularization as to a specific person, transaction or incident, the naked inference would be that race correlates to criminal behavior. Such an equation of race with suspicious criminal activity would be nothing more than a racist assumption, and I have previously held that "profile stops may not be predicated on unconstitutional discrimination based on race, ethnicity or state of residence." Laymon, 730 F.Supp. at 339.
Similarly, the mere state of origin of a vehicle's license plates can be of little if any relevance in identifying criminal activity, especially on a major interstate highway through an area that by the county's own estimate sees as many as 100,000 visitors per day. As with race, an out-of-state license plate may be useful in identifying a particular car, but without particularized information, an out-of-state license plate does not increase the likelihood that the car's occupants are engaged in criminal activity.
The other factors on the list are similarly flawed.[9] Tinted windows keep out the sun, as well as the prying looks of others; and neither function indicates that a car's occupants are not law abiding. Nor are CB antennae reliable indicators of criminal behavior. Radar detectors, of course, may indicate a desire to avoid apprehension for speeding, but unfortunately that desire is not limited to drug couriers.
While innocent behavior may provide the basis for reasonable suspicion, Sokolow, 490 U.S. at 10, 109 S.Ct. at 1587, innocent behavior that in no way distinguishes the person to be stopped from other law abiding citizens does not. United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir.1990) ("[N]either police officers nor courts should sanction as reasonably suspicious a combination of factors that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways."); United States v. Hernandez-Alvarado, 891 F.2d 1414, 1418 (9th Cir.1989) (factors describing many people are insufficient to create reasonable suspicion that a particular person is engaged in criminal activity).
In the case before me, each of the characteristics relied upon by the Task Force would have applied to a substantial percent of law-abiding motorists and therefore the decision as to which car to pluck from the stream of traffic necessarily would have been based on nothing more than a hunch. Thus I find and conclude that there is no genuine issue of material fact that between May and December 1988, members of the Task Force operated the interdiction program on the assumption that motorists could be detained based solely on their match with the above listed indicators and that such stops violated the Fourth Amendment's prohibition against unreasonable seizures.[10]

III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

A. Involvement of the Individual Officers.

Defendants maintain that the individual officers are entitled to summary judgment *345 because the plaintiffs have no evidence showing those defendants actually carried out the policy.
This case is brought as a class action. Pursuant to a stipulated scheduling order, resolution of issues related to class certification and identification of members of the class has been deferred. Because it is not yet clear who the plaintiffs will be, it is impossible to determine which specific officers might have been responsible for violating the rights of each class member. As a result, this aspect of the defendants' motion for summary judgment will be denied without prejudice to renew.

B. Qualified Immunity.

The individual defendants contend that they are protected by qualified immunity, which shields government officials from civil liability provided their alleged conduct does not violate clearly established law of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).
Once the defendants raise the qualified immunity defense, the plaintiffs must put forward facts or allegations sufficient to show: (1) that the defendants' alleged conduct violated the law, and (2) that the law was clearly established when the alleged violations occurred. Dixon v. Richer, 922 F.2d 1456, 1460 (10th Cir.1991) (citations omitted). Plaintiffs cannot prevail simply by identifying a right in the abstract and then claiming that the defendants violated it. Hilliard v. City & County of Denver, 930 F.2d 1516, 1518 (10th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991).
"Instead the ... contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (citations omitted).
If the plaintiffs meet this burden, the defendants assume the normal burden of a movant for summary judgment; they must establish that no material facts remain in dispute that would defeat their claim of qualified immunity. Dixon, 922 F.2d at 1460.
Plaintiffs allege that a reasonable officer would have known that stopping persons based on nothing more than the general characteristics of the indicators violated the Fourth Amendment. As the cases cited in section II, infra, make clear, it has been clearly established for some time that investigatory stops are not justified solely by mechanically applying drug courier profiles to individuals. Nor does a person's race, alone, justify a stop. U.S. v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607.
While a variety of considerations factor into whether a police officer's conduct is covered by qualified immunity, "[i]t is incumbent upon government officials to relate established law to analogous factual settings."[11]Eastwood v. Department of Corrections of Okla., 846 F.2d 627, 630 (10th Cir.1988) (citation omitted).
It is clear that a reasonably well-trained officer would have known at the material times that general characteristics which do not distinguish the motorist being observed from a large number of other motorists is not sufficient to establish reasonable suspicion. United States v. Smith, 799 F.2d 704, 707 (11th Cir.1986) (facts showing that a car possessed out-of-state plates, was being driven at 3:00 a.m. and the driver did not look at patrol car insufficient to establish reasonable suspicion).[12] As discussed in section II above, it is clear that the indicators alone did not distinguish the plaintiffs who were detained from a large number of other persons. *346 Therefore I conclude that the plaintiffs have put forward evidence that, in instances where the defendants stopped them based on the indicators alone, clearly established law was violated.
As a result, to be entitled to summary judgment on the basis of qualified immunity, the defendants have the burden to demonstrate that no genuine issue of material fact exists as to the legitimacy of that defense. Defendants have not made such a showing.

C. Liability of the Board of County Commissioners.

Defendants maintain that there is no evidence that stopping motorists based solely upon the indicators was a county law enforcement policy, and therefore summary judgment should be entered against the plaintiffs on the claims against the Board of County Commissioners. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (section 1983 liability may not be imposed upon a municipality unless the challenged conduct was in conformance with a municipal policy or custom).
No evidence presented indicates that the Commissioners compiled the indicators or instructed officers that a match constituted sufficient grounds to stop a motorist. This, however, does not preclude a finding of county liability, because authority to create county policy may be delegated.[13]Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986).
The application for funds to support the drug interdiction program names Officer Roybal as program director and Sheriff Johnson as financial officer, evidence that the Board delegated implementation of the interdiction program to them. There is also evidence that Sheriff Johnson and Officer Roybal instructed other officers that it was permissible to stop motorists based solely on their match to the indicators. Thus a genuine issue of material fact remains as to whether the practice challenged by the plaintiffs was a county policy.
Accordingly IT IS ORDERED that:
(1) Plaintiffs' motion for partial summary judgment as to the constitutional permissibility of the drug interdiction program is granted consistent with the findings and conclusions of this order;
(2) Defendants' motion for summary judgment is denied; and
(3) The parties and their counsel are ordered to meet and confer within eleven days of this order in a good faith attempt to settle the case without further litigation, expense or delay. The parties shall report to this court in writing within fifteen days of this order, stating the results of their settlement negotiations and whether a conference before a Magistrate Judge or some other alternative dispute resolution proceeding would facilitate settlement.
NOTES
[1] These officers include Lee Roybal, James Perry, Larry Sherrell, Jeffery Townsend, Mike McWilliams, Charles A. Phillips, Margaret Neff, Michael Bosley, Steven Huskey, Robert Dawson, Greg Casady, Dean Everding, James F. Plank, Steven Wade, Flint Chambers, Tom Carline, D.P. Zabrinski, Jeff Beavers, Cindy Hurd and A. Curtis.
[2] The Whitfields, Mr. Boudreaux and Mr. Verne are African Americans. Mr. Ferriera describes his ethnic heritage as Cape Vernon, a mixture of Brazilian and Portuguese. His skin color is black.
[3] Plaintiffs Jhenita and Janice Whitfield, Byron Boudreaux, Aguinaldo Ferriera and Michael Misukanis all provided testimony. United States v. Laymon, 730 F.Supp. 332, 336-37 (D.Colo.1990). The motion involved a stop executed after the interdiction program was reinstituted. The ultimate issue in that hearing concerned the conduct of a single officer during a single incident. The issue here is broader, whether the County Commissioners authorized a policy, implemented by Sheriff Johnson and Officer Roybal and carried out by the other officers, that deprived the plaintiffs of their constitutional rights. While the evidence offered in Laymon is relevant to the issue here, I still must consider, as to each motion, whether the movants have met their respective burdens.
[4] For example, Sgt. Perry testified in Laymon that:

"We then attempted a concept of using these indicators, if we were able to obtain enough of these without actually having a traffic stop to make an investigatory stop based on reasonable suspicion. We attempted this, and on our first case that we tried it with, the District Attorney determined that there is no way that we could develop enough reasonable suspicion to make a stop off of the indicators or the similarities."
In addition, Sgt. Perry's response to interrogatories in this case stated that officers were instructed "to use these indicators as a basis to develop reasonable suspicion."
[5] Further corroboration is provided by Sgt. Perry's admission that the December stop of the three African American motorists was based on nothing more than the indicators, that the program was then interrupted and reinstituted only after Task Force officers were instructed that a match with the indicators alone was not sufficient to justify a stop.
[6] For example, it states that the program was reinstituted, without saying that it was interrupted or why. It also states: "Approximately 22 indicators were utilized" and "There were no set indicators."
[7] United States v. McDonald, 933 F.2d 1519 (10th Cir.1991), is not to the contrary. There the Tenth Circuit stated in dictum:

"The common use of profile evidence is to make investigative stops. Courts have frequently upheld investigative stops based upon profile characteristics. See, e.g., United States v. Sokolow, 490 U.S. 1 (1989); United States v. Nunley, 873 F.2d 182 (8th Cir.1989)." 933 F.2d at 1521.
The court noted, however, that the case did not involve the issue of reasonable suspicion. Id. Thus it did not address the question presented here. In addition, the opinion states that courts have upheld stops based upon profile characteristics, not merely profiles. Moreover, the "See e.g." citations to Sokolow and Nunley make clear that the presence of a drug courier profile is not the signature of a constitutional stop. As explained above, Sokolow does not stand for that proposition and the Nunley court noted, "Nor does the government mechanically apply the `drug courier profile' to justify the stop." 873 F.2d at 185.
[8] See also United States v. Tolbert, 692 F.2d 1041, 1047 (6th Cir.1982) cert. denied, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983) ("Satisfying the drug courier profile does not, standing alone, justify a seizure."); United States v. Berry, 670 F.2d 583, 600-01 (5th Cir.1982) ("Any checklist of suspicious characteristics cannot be mechanically applied by a court to determine whether a particular search or seizure meets the Supreme Court's standards. A profile does not focus on the particular circumstances at issue.").
[9] See generally United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir.1990) (the race of the car's occupants, out-of-state plates, the driver's eye contact with state trooper, no visible luggage and fact that car was insured by third person did not lead to particularized suspicion); United States v. Hernandez-Alvarado, 891 F.2d 1414, 1418 (9th Cir.1989) (occupants' nervous demeanor, reduction in speed, residence in neighborhood associated with drug trafficking, possession of a vehicle purchased from dealer associated with drug trafficking, presence of a two-way antenna and size of the vehicle's trunk did not establish reasonable suspicion).
[10] Because I find that the stops violated the Fourth Amendment, I need not address in this order the plaintiffs' claims based on the First Amendment right to travel and the Fourteenth Amendment's Equal Protection Clause.
[11] Defendants argue that qualified immunity is appropriate because officers must weigh competing interests to determine if a stop is justified. This argument is without merit, for such concerns arise only in cases where explicit balancing is required such as government regulation of employee speech, Wulf v. City of Wichita, 883 F.2d 842 (10th Cir.1989), or whether to remove a child from her parents' home. Whitcomb v. Jefferson County, Dep't of Social Servs., 685 F.Supp. 745 (D.Colo.1987). In making the decision whether to detain an individual, officers must look for reasonable suspicion, not weigh society's interest in reducing crime against a particular individual's interest in liberty.
[12] Two other cases, although decided after the events in question here, also are instructive. Tapia, 912 F.2d at 1371; Hernandez-Alvarado, 891 F.2d at 1418. See footnote 9, infra.
[13] Defendants' argument that the plaintiffs must show deliberate indifference is off the mark. Deliberate indifference is required when § 1983 plaintiffs make a claim for municipal liability based on failure to train. See Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). No such claim is made by the plaintiffs here.